SCOTT, Guardian, *versus* NELSON, Ex'or.

QUESTION IN THIS CASE.

*Relative to the construction of the word, "children," in a will.*

1. Where a testator directed, by his will, that certain estate should be equally divided among his *children,* and stated that certain amounts received by them, should be rendered by each to the estate, before being entitled to a distribution; and among those who had obtained advancements, named his son, T, as having, *in his life-time,* received a specified amount—it was held, that T D, the son of T, and grand-son of the testator, was included in the term "children," and entitled to a distributive share, under the will.

This case came up, on exceptions to the report of commissioners, appointed by the Orphans' Court of Greene, to distribute the estate of William Bell.— The commissioners, in their report and distribution, having allotted to Turner D. Bell, the grand-son of the testator, an equal share in his estate, exceptions were taken, and sustained by the Court, to the report—on the ground, that the said Turner D. Bell was not entitled, under the will of William Bell, to any part of the estate. The will of William Bell was as follows:

"I, William Bell, of Greene County, do hereby make my last will and testament, in manner and form following, that is to say: First—I will all my real estate, to my wife, Elizabeth Bell, for and during her natural life, and, at her death, to be equally divided among my children. Secondly—I will her the following personal property: a negro man, Col-

SCOTT, guardian, *vs.* NELSON, ex'or.

lin, and his wife, Jenny, and Eliza, her child; and a fourth part of the hogs, cattle, sheep, horses, mules, farming utensils, household and kitchen furniture, and one fourth part of the corn and fodder, which may be on hand, at my death. *I will the balance of my property, to be equally divided amongst my children; Margary having received eight hundred dollars—Turner, in his life-time, fourteen hundred dollars, and Elizabeth Ridgeway, fourteen hundred; these amounts have to be rendered by each, to my estate, before they are entitled to an equal distribution with the younger children.* Alexander, having received two hundred dollars, to enter a piece of land, has to render that amount into the estate. John, having received fourteen hundred dollars, has to render that amount into the estate, before he is entitled to an equal cistribution. I appoint my friend, J. John Nelson, my executor, to see my will carried into effect.

"July 21, 1831.                    WM. BELL."

Argued by *Stewart & Thornton*, for the plaintiff in error; and by *Mr Erwin*, for the defendant.

HITCHCOCK, C. J.—This is a writ of error from the County Court of Greene County, sitting as a Court of probate, to reverse a decree of said Court, giving a construction to the will of William Bell. The will is in the following words, viz:

" 1. I will all my real estate to my wife, Elizabeth Bell, for and during her natural life, and, at her death, to be equally divided amongst my *children.*

" 2. I will her the following personal property, to wit, [naming some negroes, and other personalty.]

" 3. I will the balance of my property to be equal-

ly divided amongst my *children*, : Margary, having received eight hundred dollars; Turner, *in his life-time*, fourteen hundred dollars; and Elizabeth Ridgeway, fourteen hundred; these amounts have to be rendered, by each, to my estate, before they are entitled to an equal distribution with the younger children. Alexander, having received two hundred dollars, to enter a piece of land, has to render that amount into the estate. John, having received fourteen hundred dollars, has to render that amount into the estate, before he is entitled to an equal distribution. I appoint my friend, John Nelson, my executor," &c.

Turner Bell, who is mentioned in the will as having, in his life-time, received fourteen hundred dollars, left a son named Turner D. Bell, who, by his guardian, claims the share to which his father would have been entitled, had he been living. The commissioners who were appointed to divide the personal estate, gave him one share. Exception was taken to this, before the Court below, who sustained the exception; and decreed that he was not entitled to any thing under the will.

The exposition of wills has always been governed by the *intention* of the *testator*. He, not being supposed to be acquainted with legal form and language, a greater latitude of construction is permitted, to leave to every one the power to make his own will in his own way. It is emphatically said, that *intention* is the pole-star in the direction of devises.[a] The words of a will are the means from which to collect the intention; and to arrive at this, the law neither requires nor expects technical words.[b] Nay, more: when technical words are used, their techni-

[a] 2 Bur 1112
2 East, 42

[b] 5 Term R 721.

SCOTT, guardian, *vs.* NELSON, ex'or.

cal signification will yield to the testator's meaning, if he explains them. The word *heirs*, and *heirs of the body*, are, techically, words of *descent*. Yet, if it be the intention, these words will be accepted as words of *purchase*.a So also, *issue, children, son*, are technically words of *purchase;* yet they will be accepted as words of *descent*, if it be the testator's *intention*.b

So also, under the word *children*, grand children, and great grand children may take, if it be necessary and proper to effectuate the intention of the testator. And as the true construction of the will, before the Court, depends upon the meaning of the word testator, in the use of the *children*, I shall confine my remarks to that point.

It is admitted, that the word *children*, does not ordinarily and properly speaking, comprehend *grand* children, or issue generally.

There are two cases where it is permitted—

1. From necessity—where the will would be inoperative, unless the sense is extended beyond its natural import : and,

2. When the testator has shewn, by *other* words, that he did not intend to use the word children in its proper actual meaning, but in a more extended sense.

Under the first of them, *Wylde's case* is found : which was upon a devise to a man and his *children*. It was held, if there were no children at the date of the will, the *father* would take an estate-tail, and children would mean *issue*; for it was evident something was intended for children : but none being in issue, they could take nothing except through the father ; and he could transmit nothing to them, unless

he, had an estate of inheritance. It was *necessary*, therefore, to construe the word "children," issue, on account of the general apparent intention,[a]

[a] 1 Rop. on L 69—10 Vesey 201.

Cases under the second head, are such, as when the words "children" and "issue," are indiscriminately used by the testator—thereby shewing his intention to use the former word in its enlarged sense, so as to include grand children.

[b] 2 Atk. 221.

In the case of *Wythe vs. Blackman*,[b] Col. Thurston, by a voluntary deed, limited real estate, after the death of himself, and nephew John, and failure of estates in tail mail, to John's first and other sons, to four persons—Lady Chary, Mrs. Wythe, and Mrs. Blackman, his three sisters, and the fourth was his niece, daughter of a deceased brother—to sell, and divide the money and mesne profits among themselves, naming them, or the respective *issues* of their bodies, if they or any of them should be dead, upon the failure of such issue of John, viz, to each of them, or their respective children, a fourth part. But, if any of them should be dead, without issue, on failure of such issue of John, then, to their survivors, or to their respective children, equally, if any of them should be dead, leaving issue. John survived the testator, and died after being in possession of the estate, and without issue. The three sisters and niece died before John, the niece leaving no issue. But at the death of John, lady Chary had three children; Mrs. Wythe, both children and grand-children, and Mrs. Blackman, grand-children, only. One of the questions was, whether the children of Lady Chary and Mrs. Wythe, were entitled to have the whole estate divided among them, in two shares, or whether the grand-children of Mrs. Blackman, and the great

grand-children of Mrs. Wythe, were entitled to participate with them. A question, whether the import of the word *issue*, was to be restrained by the word *children*, or the word *children* enlarged by that of *issue ;* and Lord *Hardwick* decided, that children, grand-children, and great grand-children were collectively entitled.

In the case under consideration, the testator had, at the date of the will, children whom he names, and one grand-child whom he did not name ; and it is admitted, that had he given in his estate to his *children* generally, or by name, without making any allusion to his deceased son, Turner, that the word " children" would be taken in its ordinary sense, and that the grand-children would be excluded. But, it is contended, that in as much, as in the first clause he gives his estate, after the termination of his wife's life, to his children generally ; and that, in the third clause, when he comes to dispose of his personalty and the *residuum*, in which he names his sons and daughters, alludes to the sums they had received in advancement, and requires those sums to be returned to the estate before distribution, and in this clause names his deceased son, Turner, and the share he had in his life-time received, and requires it to be returned also before a division—the testator must have had the son of Turner in his mind, and that he included him in the general term *children*, with the others. And in order to strengthen this construction, reference is had to another rule of interpretation, which is, that " effect ought to be given to the *whole will*, if possible, so that every word ought to have ef-

fect, unless inconsistent with the general intention." We are inclined to this interpretation of the will.

Although wills operate from the death of the testator, yet, as a general rule, they are construed from the making; and we are to consider what was probably passing in the mind of the testator when writing his will.

Had the testator, in this case, overlooked the event of his son's death, and had made no allusion to it or to his grand-son, the Court would not rectify the omission by intendment; as this would be, rather making, than construing the will. But when, as in this case, the deceased' son is named, and the same directions given, relating to his interest, as is given to the rest, can we draw any other conclusion than that he intended that son's interest to be represented in the distribution; and if so, to whom would it go, except to the grand-son? Otherwise, the words would be inoperative—with it, we do not interfere with the general intention.

If the testator had made no will, by the general law of descent, the grand child would, by right of representation, have stood in the shoes of his father, and taken an equal share with the other children. As the testator followed the law of descents, in giving an equal share to his children—in doing which he thought proper to name his deceased son, requiring the same to be done by him, that was to be done by the others—may we not well say, that he intended to follow the laws of descent—and, in this instance, construe the term *children*, into a word of descent, instead of a word of *purchase;* which, technically speaking, it is construed. Indeed, when a person devises to his heir at law, he cannot make him ta k

SCOTT, guardian, *vs.* NELSON, ex'or.

by *purchase*, if he devises to him the same estate that
he would take by descent.[a]

Presuming that the testator knew what the law
of descent is, are we not bound to infer, that from
his allusion to his deceased son, he intended only to
follow the law of descent, except so far as provision is
made for his wife ; and that not knowing the technical
meaning of the word *children*, he intended to provide
for the grand-child, by bringing into the will the share
of his father, and in that way secure, what the law
would have done, without the will.

Indeed, it is admitted in argument, that probably
it was his intention, to give a child's share to this
grand-child.   But, it is contended, that that inten-
tion has not been legally expressed.; or, if expressed,
that it can not be sustained, without violating the
known and well settled rules of law.

It is conceded, by the counsel for the defendant
in error, " that in construing wills, every word is to
have effect, according to its natural import, and that
words of art, are to be construed according to their
technical sense; unless, upon the whole will, it ap-
pears plainly not to be so intended; and a list of ca-
ses, from 2 Bridg. Digest, 734, are referred to.

The competency of testimony to shew, that Tur-
ner Bell left a son, is not questioned.   Now, if the
principle, that every word of a will is to be made to
have effect, if it can consistently be done, is to be ap-
plied to this case—what is more plain, than that, in
directing that the several advancements, to Margary,
to Turner, *in his life-time,* and to Elizabeth, should
be returned to the estate, before they should be enti-
tled to an equal distribution. How can it be denied, that
the testator intended to establish a principle of dis-

[a]2BlaCom.
241; 1Sal.
233; 2Ves.
& B. 187

tribuion which should recognise the right of the legal representatives of his deceased son Turner, and if so, how can we accomplish that intention, without considering the word "children," in its enlarged and comprehensive sense, as including grand children—thereby considering it sinonymous with the word, "issue?"

If the Court, as was done in Wylde's case, above referred to, in a devise to a man and his children, considered the father as taking an estate tail, thereby giving the word "children," the effect of the word "issue," to prevent the devise becoming inoperative; and if, as in the case of *Wythe vs. Blackman,* where it was not necessary to give the enlarged construction to the word, "children," to prevent such a consequence, (as there were children in that case,) but purely to effectuate the intention of the testator, gave the word the same enlarged sense; surely we are justified in giving it the same construction, in a case where the intention is equally manifest.

But, it is contended, that, to give the will this construction, the Court will violate a known rule of law; which is, "that a devise or bequest to one, not in being, at the time of the execution of the will, is, void:" and, in farther illustration of this position, it is said, that if the bequest had been made, to Turner, when living, and he had died before the testator, his heir would take nothing by the will.

These positions of law are not controverted; but their application to the present case, is questioned. The devise and bequest are not made to Turner Bell—his death is recognised; and his son does not claim through his father, and as his legal representative—he claims, as being one of the *children* of the

testator, in the sense in which the testator meant to use the word : that is, as one of the *issue* of the testator.   It is undoubtedly true, that if Turner had been alive, at the execution of the will, and the bequest had been made to him, and he had died before the testator, the bequest would have lapsed.   The testator, in such a case, having, at the date of his will, fixed the meaning of the word "children," and having confined it to its technical meaning, the subsequent act of Providence, in removing the heir from this life, before the death of the testator, does not authorise the Court to change the construction, so as to accommodate the will to the change of circumstances.   The *effect* of a will, may be changed, by Courts, subsequent to its execution ; but not the *intention*—if so, it would not be the intention expressed in the will.   A testator may, and they often do, anticipate events and provide for them, which may often become the subject of legal construction ; but still the intention of the testator is to be preserved.[a]

The case of *Radcliffe* vs. *Buckley*,[b] is mainly relied upon, by the defendant's counsel, to support his construction of the will.   In that case, James Buckley, by his will, dated the 4th April, 1799, disposed of all his personal estate, in the following manner— "All the residue, and remainder of my personal estate and effects, whatsoever, and wheresoever, I give and bequeath unto and amongst all the children, lawfully begotten of William Buckley, Henry Buckley, John Buckley, Thomas Buckley, and Ann, the wife of Hugh Shaw, my late brothers and sister, deceased, to be equally divided amongst them, in their respective parents' stead, *per stirpes*, and not *per capita*, share and share, alike, if more than one; and if

[a] 3Bur.1541 1T. R.201; 3 ib.85–6— Wil.297; 2 Bar &C.69

[b] 10Ves.195

but one, then I give the same wholly to that one."
All the brothers, and the sister were dead, at the exe-
cution of the will; at which time there was issue of
William Buckley, three children living, and several
grand-children, by four deceased children; the other
brothers, also, left children, and grand-children, by
deceased children : Ann Shaw had several children,
who were all dead, at the making of the will, three
of them leaving several children.

The Court decided, that the children, who were
living at the date of the will, were entitled to the es-
tate, to the exclusion of the grand-children.

I shall not go into an extended examination of this
will, to distinguish it from the one under considera-
tion.    The reasoning of the master of the rolls, in
that case, exhibits such material distinctions between
that and this, that it will only be necessary to advert
briefly to them, in order to shew its irrelevancy.

In the first place, the distribution is to be *per
stirpes*, and not *per capita;* thereby enacting classes,
which is not the case in the will before us.

2. The word "children," was used but once in the
will, and to give it the extended construction, in one
part of the will, and reject it in the other—to preserve
another part, as the different sets of children were to
be provided for, was not admissible : here, no such
incongruity exists.

3. The will was, confessedly, ambiguous, and the
Court were seeking to get at the general intention—
to do which, they, were obliged to exclude the limit-
ed intention in favor of Ann Shaw's grand-children.
Here, there is no ambiguity.    To let in the grand-
child, here, we do not have to exclude any of the
others named.    And—

SCOTT, guardian, *vs.* NELSON, ex'or.

4. The fact, that the testator expressly referred to the death of his son, Turner, in making the bequest, directing his advancement to be brought into hotchpot, before distribution, shews that his mind was directed to that object, which can only be effected, by giving the word its extended signification. There was no such allusion, in the will of Buckley; and, though it was proved he knew of the death of Mrs. Shaw's children; yet, the fact may not have been present to his mind, at the making of his will.

In every view, therefore, in which we have been enabled to consider this case, we are satisfied that Turner D. Bell, the grand-child, is entitled to a distributive share of the estate of William Bell, under the will.

The judgment of the Court below is reversed, and the decision of the commissioners sustained.

Reversed and remanded.

HOPKINS, J., not sitting.